Argued   October   12,   affirmed   November   16,   rehearing   denied
December  28,  1926.

## LEONA J. BARRON v. GEORGE DUKE ET AL.

## J. J. BARRON v. GEORGE DUKE ET AL.

## J. J. BARRON v. GEORGE DUKE ET AL.

(250 Pac. 628.)

Damages.

1. It is province of jury to weigh all testimony submitted in suit for injuries sustained in automobile collision.

Appeal and Error.

2. Testimony submitted by movant, after introducing motion for nonsuit, will be considered, on appeal, in reviewing question of refusal to grant nonsuit.

Appeal and Error.

3. Defendant cannot complain because jury understood evidence in same manner as did his counsel.

Damages.

4. Plaintiff, in suit for injuries sustained in automobile collision, may prove any injury to his person and all damages usually or ordinarily resulting from wrongful act alleged or from nature and kind of injuries described.

Damages.

5. In suit for injuries sustained in automobile collision, testimony taken altogether, including evidence of plaintiff's serious condition, nervousness and development of disease *held* sufficient to take case to jury on question of permanent injury.

Damages.

6. Words "probably" and "likely" are used synonymously in indicating consequences likely to flow from an existing condition of an injured person.

Damages.

7. Future consequences which may reasonably be expected to follow an injury may be given in evidence, for purpose of enhancing damages.

Damages.

8. Future consequences from injury enhancing damages must be such as, in ordinary course of nature, are reasonably certain to ensue, in order that same may be considered by jury.

4.  See 8 R. C. L. 620.
7.  See 8 R. C. L. 542.

Damages.

9. Under claim for permanent injuries sustained in automobile collision, instruction that it is not enough for jury to believe that permanent injury is possible *held* proper.

Evidence.

10. Opinion evidence is admissible as to probable effects or duration of existing condition of an injury, while evidence of future consequences from personal injury, not present at time but contingent, speculative, and merely possible, is not admissible.

Evidence—Physician's Opinion as to Probable Future Consequences of Injury is Admissible, if They can be Reasonably Expected to Happen in Ordinary Course of Events.

11. Opinion of physicians is admissible to show probable future consequences of an injury, when consequences anticipated may be reasonably expected to happen in ordinary course of events and are not merely speculative or possible.

Evidence—Testimony as to Probable Results from Subjective Injury to Plaintiff's Head by Comparing General Results to Other Persons Suffering Similar Injuries Held Proper.

12. Injury to head of plaintiff in automobile collision being subjective, it was proper for her attending physician to explain probable results by comparing general results to other persons who had suffered similar injuries.

Evidence.

13. That physician said he did not know what future results from existing injury to person would be does not justify withdrawal of his evidence of probable future results from jury.

Appeal and Error—Alleged Improper Remarks of Counsel Referred to for First Time in Motion for New Trial, Without Previous Request to Instruct Jury to Disregard Remarks, cannot be Reviewed on Appeal.

14. Alleged remarks of counsel as to offer by defendant to pay expenses incurred by plaintiff for injuries sustained in automobile collision, referred to for first time in motion for new trial, with no previous request to instruct jury to disregard remarks, cannot be reviewed on appeal.

Appeal and Error.

15. Only error which is legally excepted to can be reviewed on appeal.

Appeal and Error, 3 C. J., p. 843, n. 67, p. 862, n. 21, p. 895, n. 52; 4 C. J., p. 676, n. 86 New, p. 1043, n. 45, p. 1044, n. 47.

Damages, 17 C. J., p. 762, n. 1, p. 764, n. 8, p. 1007, n. 20, p. 1059, n. 63.

Evidence, 22 C. J., p. 673, n. 70, p. 674, n. 71, p. 675, n. 77, 78. Trial, 38 Cyc., p. 1516, n. 57.

10. See 8 R. C. L. 635.

From Deschutes: T. E. J. DUFFY, Judge.

Department 2.

These appeals pertain to three cases. The case of Leona J. Barron against the defendants George Duke and Fred Duke is an action for personal injuries and she prays for general damages in the sum of $10,000, and $500 special damages. The case No. 1, of J. J. Barron against the same defendants, is for personal injury. He claimed general damages in the sum of $5,000, and special damages of $125. The case No. 2, of J. J. Barron against the same defendants, is an action for $1,000 damages to an automobile.

For the purpose of expediting the trial of the cases, the three cases were consolidated by the trial court and tried at one time before the same jury, resulting in verdicts for the plaintiffs as follows: For Leona J. Barron, $8,964; for J. J. Barron, in case No. 1, $775; in case No. 2, $700.

The actions grew out of an accident occurring in the City of Bend, Oregon, on the third day of December, 1924, as a result of a collision between an automobile driven by plaintiffs and an automobile belonging to the defendants used for the transportation of passengers between Bend and Klamath Falls and way points. The cars collided with each other in the early morning on one of the principal streets in the City of Bend. As a result of which collision the plaintiff's car, which was an Essex sedan, was precipitated on to the sidewalk on the north side of Greenwood Avenue and was wrecked. Mrs. Barron, the wife of the owner and driver of the Essex car, was thrown through the glass door of the car and struck the sidewalk on her head. She was badly cut about the body and face in numerous places, was rendered

unconscious and supposedly received a fracture of the skull. She was taken to the hospital at Bend, where a severe contusion of the brain developed, and after suffering extreme agony for several weeks and after her spinal cord had been tapped to relieve the pressure on the brain, she recovered sufficiently to leave the hospital, but thereafter continued to suffer continually from severe headaches and continued spells of nervousness, and up to the time of the trial, which was held on April 20, 1925, she had been utterly unable to perform the duties of a trained nurse, which position she was qualified to fill and was filling at the time of the accident. She was earning $155 per month as a trained nurse when the injury occurred.

J. J. Barron was also thrown through the glass door of the sedan and was severely cut about the face and arm and the muscles, veins and arteries of his wrist were severed, and he was also taken to the hospital, where he remained two or three days and it was necessary to tie up the veins and arteries and sew up the laceration in the wrist, and after he got out of the hospital he was unable to do any work and was under the doctor's care for sixteen days and at the time of the trial was still suffering from the injury to his arm to the extent that when he tried to do a day's work at his trade of washing automobiles, he found it impossible to use his hand.

The plaintiffs each allege permanent injuries and place the responsibility for the accident upon the defendants. The defendants answered each of the three cases separately, admitting that on the date of the accident they were the operators of the automobile which collided with the plaintiff's car, but deny that the automobile at that time was being used for their benefit and allege that it was being driven by one

George Stanley, who was not authorized or directed to drive the car but forbidden to do so. That he drove it at the time of the accident without the knowledge or consent of the defendants, and that they were therefore not responsible for any damage to the plaintiffs; that the plaintiffs were negligent in that they were driving at an excessive rate of speed and attempted to swerve at the wrong side of the street, and that George Stanley in attempting to avoid the collision swerved to the left of the center of the intersection, but that he did so in order to avoid a collision; that the damages resulting to plaintiffs, if any, were caused by their negligence.

AFFIRMED.   REHEARING DENIED.

For appellants there was a brief over the names of *Mr. Barnett H. Goldstein* and *Mr. A. C. Yaden,* with oral arguments by *Mr. H. H. DeArmond* and *Mr. Tom Mannix.*

For respondent there was a brief and oral argument by *Mr. Jay H. Upton.*

BEAN, J.—At the close of plaintiff's testimony in chief the defendants moved for a nonsuit and at the close of all of the testimony the defendants requested the court to withdraw from the jury the question of permanent injuries for the reason that there was no testimony tending to show that either of the plaintiffs was permanently injured, and requested a directed verdict for the defendants. For the same reason the defendants allege error of the trial court in charging the jury as follows:

"In the case of Leona J. Barron and J. J. Barron against the defendants for recovery of personal injuries, in regard to the claim for permanent injury,

I instruct you that before you are warranted in allowing the plaintiffs any sum by way of compensation for any alleged permanent injuries, if you should come to the question of damages, you must be reasonably certain, from a preponderance of the evidence, that the plaintiff has sustained permanent injury and disability, and it is not enough that you may believe that a permanent injury is possible.

''If, after considering all of the evidence in the case of J. J. Barron against the defendants you should reach the conclusion that the plaintiff J. J. Barron is entitled to recover against the defendants, the next consideration would be the question of damages. In that regard I charge you, gentlemen of the jury, that the true measure of damages in cases of this kind is compensation, that is, what sum will fully, fairly, and justly compensate him for the physical injuries he has sustained, if any, as a direct, natural, and proximate result of the particular injury or injuries he has sustained, if you find he has sustained the injuries or any of them as alleged.

''Before you award damages for a permanent injury, you should be satisfied by a preponderance of the evidence that the injuries are permanent, but if you find that they are permanent then your award should be on the basis of permanency. If you find that the injuries he has sustained are temporary then your award should be on the basis of temporary injuries. But whether temporary or permanent, the limit and measure of compensation should be the true rule and guide in arriving at damages in cases of this kind, and in no event should you award plaintiff any greater or more damages than have actually been proven.''

It is the contention of the defendants that in order for the plaintiffs to be entitled to recover damages or have the jury consider damages for permanent injuries, they must show by a preponderance of the evidence that permanent injury will probably result;

or that Mrs. Barron has probably sustained a permanent injury.

This appears to be a fair statement of the law. Defendants contend that there was no evidence of Mrs. Barron's receiving permanent injury and that there was total lack of proof that the injuries were probably permanent. This is the first question, therefore, to be considered. Mrs. L. J. Barron, as a witness in her behalf, testified upon this point as follows:

"Q. Now then, when you recovered consciousness in the hospital, state to the jury what your physical condition was.

"A. My physical condition was mostly pain. I have a scar on the right side of my eye, on the right side of my face above the eye, where you can see the skin has been torn, just torn away, and I have a deep scar, right in the center, you can see [indicating]; right in my chin there is a scar about two inches deep, I should judge, which bled profusely. My hand was so badly skinned and torn that it had swollen to again its size and it was impossible for me to move around. On my back I have five scars, one across the right shoulder, I should judge about three inches in length and about two inches deep. Just below it I have another one that is about two and one half inches in length. In the center of the spine, over to the right is a scar that will show it is cut in an L-shape, one going down about two inches long, and one cutting across, about two inches across, and on the end it is torn away just as if the flesh had been scraped. Just below that there is another one about the waist line. I should judge it is two inches long. On the left side of my hip is one an inch long. It looks as if it had been dug out by a spoon. My shins, the one was badly bruised and skinned; I just couldn't have control over that; I couldn't move unless there was pain in my legs. My headaches—I have had headaches ever since the time of the accident. I have not passed

there without terrible headaches, and I have an extreme nervous condition. I am just unable to control it. That was caused by my accident.''

Dr. Besson, whose qualifications as a physician and surgeon are admitted, testified as a witness for plaintiffs in part, to the purport, that he attended plaintiff Leona J. Barron a few hours after her injury; that she was suffering from a blow on the head in the region of the right temple, the principal thing being the head injury; she had considerable evidence of contusion of the brain, the pressure within the cranium, and that several days afterward the symptoms of increased pressure continued to ˙such an extent that they punctured the spinal canal. She complains a great deal about nervousness, ''She is quite a changed · person.'' Dr. Besson candidly stated that it was very difficult to tell what would be the result of her injury. The witness used the following language:

''It is difficult to tell what the outcome of Mrs. Barron's brain injury will be, because those things vary, depending on which portion of the brain is affected. The higher centers, which control the emotions and the temperament and the life of the individual, might be affected, and it is very difficult to put your finger on the changes that have taken place. The patient complains of headache, and we know that many of these cases that have injuries of this kind do have persistent headaches for a long time. Some of their very personalities are changed. A man who might be an outstanding, reliable, individual after a serious brain injury later on may have different conceptions of what right and wrong are and have his whole mentality disturbed, be unable to carry out work that he has done before, and be unable to remember things, and be very much incapacitated.''

The doctor further stated:

''Mrs. Barron at the present time is in a nervous state, which is very exceptional and different than

her usual one. The headaches of which she complains are not surprising to me, because we find these things very frequently in head injuries. Whether they will clear up or not,—and that it seems to me is what we are trying to arrive at, as to whether her condition is a permanent one,—I can't say. If somebody has pneumonia, the patient may get well; they may die. Some of them die, a good percentage of them. A large percentage of people with brain injuries as severe as Mrs. Barron has had and of the type that she has had, will have such mental changes, epilepsy, or something of that sort, happen. Whether it will happen in Mrs. Barron's case or not, I don't know."

He stated, "Whether or not Mrs. Barron had a fractured skull is difficult to determine."

On cross-examination this witness stated, among other things, that some time later on they had an X-ray picture taken of Mrs. Barron's head but learned nothing therefrom. He further stated:

"From your examination you are not able to determine whether or not there is any permanency to her injury?

"A. The only thing I can say about that, Mr. De-Armond, is that guided by the seriousness of the brain injury which she had, which was demonstrated by the evidences of pressure that she had on her brain, the fact that her pulse rate went so abnormally low, her pulse got down so far as forty-two a minute, which is probably half of her normal pulse rate, and could only have been caused at that time by pressure on her brain, the fact that that persisted as long as it did, the fact that her headaches have persisted as long as they have, that this nervous condition has developed and persisted as long as it has, I am much impressed by the fact that she had a serious brain injury. How soon it will clear up, I don't know.

"Q. Now, Doctor, isn't it a fact that if there is likely to be any disagreeable results from this injury, that it would be epileptic; that would be the most likely thing?

"A. Not the most likely, but just as likely as any other, serious or permanent injury or subsequent injury. * * You might call it, if you are hunting for a specific term for an epilepsy following an injury, a traumatic epilepsy. Those cases frequently come to operation in later years, if the epilepsy is of a type which can be localized to one particular area in the brain.

"Q. And can be cured by surgery?

"A. Sometimes by operation, but not consistently or constantly. Epilepsy is such a hopeless thing that one feels that you might suggest operation to those patients because occasionally one gets a result from operation. The percentage of them don't. * * "

That they went through various tests in making the examination to determine the extent and used an instrument known as a "spinal menometer" to further determine the degree of pressure. Dr. Besson testified:

"You understand that the evidences of Mrs. Barron's pressure you see, on the brain, have cleared up. The pressure has cleared up. The point is now is what that pressure did to her at that time."

Dr. J. C. Vandevert, who is also admittedly qualified as an expert, testified as a witness for defendants. There is considerable contention on the part of defendants because Dr. Besson did not use the word "probable" in describing the permanency of Mrs. Barron's injury. The examination of Dr. Vandervert by counsel for the defendants shows that the testimony of Dr. Besson was so understood. Dr. Vandevert stated that he had made an examination

of the physical condition of Mrs. Barron and testified in part as follows:

"I examined Mrs. Barron on April 20th.  She came to my office about 4 o'clock in the afternoon.  I found her age was twenty-eight, her weight one hundred thirty and one-half, and on external examination, external observation, I found her extremely nervous, and her body had a slight cold sweat over the body, and on palpation over the right temple I found tenderness she complained of.  She complained of headaches, said she had to take medicine to relieve her headaches.  When I commenced talking to her, she commenced crying and seemed to be extremely nervous.  I examined first externally the back, found on the right side three scars a little above the middle of the back; on the left side I think there were two.  She told me she had some more little scars, I think, on the lower extremities, which I didn't look at.  I found also on the right temple a slight scar, small scar.  It looked as though it might have been an injury or bruise of some sort."

He stated, as did Dr. Besson, that he could not tell whether or not she had sustained a permanent injury; that *he* saw she was nervous—

"Is there any way to tell what produced the nervous condition?

"A. Not that I know of.

"Q. Is it necessarily produced by the injuries that were previously incurred?

"A. I could not tell, because I don't know what her previous condition was, only knowing her.  I never knew of her being sick.

"Q. I mean, is the present nervous condition a natural and necessary result of the injury sustained in an accident?

"A. Well, it could be, yes, sir. * *

"Q. Did you hear Dr. Besson testify?

"A. I heard part of his testimony.  I didn't hear it all.

"Q. Did you hear him testify as to the probably epileptic results from an injury to the brain such as he described?

"A. Yes, I heard him testify that it could develop from an injury.

"Q. You heard him describe the injury as he observed it to the head?

"A. Yes.

"Q. What kind of epilepsy, if any, would result from an injury such as he described?

"A. Well, as I understand it, there isn't any of us that know a great deal about the cause or origin of true epilepsy. True epilepsy itself does not occur from an injury, but we have different forms of epilepsy developing from brain injuries.

"Q. They are curable?

"A. Some of them are, by surgical operations. If the point of injury can be specifically located, it is possible to cure it by surgical operation. * *

"Q. Is that a likely result of such an injury as he described there?

"A. It often happens."

Dr. Besson's testimony indicated that Mrs. Barron's brain trouble could not be "localized." The testimony of Dr. Besson tended to show that the usual "likely" and "probably" result of Mrs. Barron's injury, would be "epilepsy," or some other "serious" or "permanent injury."

The interrogatories of counsel for defendants indicate that the testimony of this witness was then so understood. The defendant undertook to controvert such evidence by the testimony of Dr. Vandevert, but instead of doing so, really confirmed the testimony on the part of plaintiff to quite an extent.

1-4. It was the province of the jury to weigh and consider all of the testimony that was submitted on behalf of both plaintiff and defendant. It is a well-settled rule that where a motion for nonsuit is inter-

posed and the movant thereafter introduces testimony pertaining to the issues, all the testimony thus submitted will be considered on appeal in reviewing the question of the refusal to grant a nonsuit: *Rae* v. *Heilig Theatre Co.,* 94 Or. 408, 410 (185 Pac. 909). Defendant has no good reason to complain because the jury understood the evidence much the same as did counsel for defendant. A plaintiff is entitled to prove any injury to his or her person and all damages that usually or ordinarily result from the wrongful act alleged, or from the nature and kind of injuries described. It is the fact of injury that is elemental, not the nature or character of the particular wounds and hurts which necessarily and naturally result from the negligent act: 8 R. C. L. 620, § 162.

5. Taking the testimony altogether, that of the expert and lay witnesses, there was sufficient evidence of a permanent injury of Mrs. Barron to take the case to the jury. There was no error in the refusal of the court to withdraw the question of permanent injury of Mrs. Barron from the consideration of the jury.

6. It will be noticed from the testimony that in referring to the extent of the injuries of Mrs. Barron, the words "likely" and "probably" are used in describing a natural result of her injuries. One definition of the word "likely" in Webster's New International Dictionary is "in all probability; probable." The language used in the case of *Cross* v. *Syracuse,* 200 N. Y. 393 (94 N. E. 184, 21 Ann. Cas. 324), reviewing the case of *Strohm* v. *New York, L. E. & W. R. R. Co.,* 96 N. Y. 305, quoted in *Rugenstein* v. *Ottenheimer,* 70 Or. 600, at page 605 (140 Pac. 747), is as follows:

120 Or.—13

"The reasonable certainty rule, therefore, laid down in the Strohm case applies only to the development of diseased conditions apprehended in the future, but not present at the time of the inquiry. There is no intimation in that case that opinion evidence is not properly receivable as to the probable effects of duration of an existing condition. There are many subsequent cases which show that this court did not intend to hold that expert testimony was inadmissible as to the consequences likely to flow from the present condition of an injured person."

This discloses that the words "probable" and "likely" are used synonymously in indicating the consequences likely to flow from an existing condition of an injured person.

7–9. Future consequences which are reasonably to be expected to follow an injury may be given in evidence for the purpose of enhancing the damages. Such apprehended consequences must be such as in the ordinary course of nature are reasonably certain to ensue, in order that the same may be considered by the jury: *Pittsburgh, F. W. & C. R. R. Co.* v. *Moore,* 110 Ill. App. 304. The trial court correctly informed the jury that "it is not enough that you believe that a permanent injury is possible." *Rugenstein* v. *Ottenheimer, supra; Cross* v. *Syracuse, supra.*

In the case at bar the testimony indicated that Mrs. Barron's present condition was serious, that she was nervous and a "changed person." The injury or disease had already developed, and affected her. The only problematical question that appeared was, what form or name the existing disease would take in the future, or what its duration would be, or whether possibly there would be an improvement in her condition. We quote from the language of Mr. Justice

BURNETT in *Rugenstein* v. *Ottenheimer,* 70 Or. 600, at 608 (140 Pac. 747, 750), as follows:

"In the very nature of affairs permanency of injury, future suffering, and the like are problematical and speculative in most cases other than those where loss of bodily members is involved. Hence the rule is that at least a probability of such elements of damage must be shown to exist. To show a mere possibility is but a failure of proof."

10–12. In that case the physician said "it was impossible for any physician to tell the extent of the injury because it sometimes shows up ten or fifteen years afterwards," and this court held that such evidence was properly admitted to the jury and its weight and credibility were questions for the jury. Opinion evidence is properly receivable as to the probable effects or duration of an existing condition of an injury, while evidence of future consequences from a personal injury which is not present at the time, but are contingent, speculative and merely possible, is not admissible: *Cross* v. *Syracuse, supra;* see, also, *Ahonen* v. *Hryszko,* 90 Or. 451 (175 Pac. 616, 177 Pac. 63). The opinion of physicians may be admitted to show the probable future consequences of an injury, when the consequences anticipated are such as in the ordinary course of events may be reasonably expected to happen, and not merely speculative or possible: 2 Jones on Evidence, § 380. The injury to the head of plaintiff, Leona J. Barron, being subjective, it was proper for the attending physician, Dr. Besson, to explain to the jury the probable results by comparing the general results to other persons who had suffered similar injuries: *Hines* v. *Dean,* 96 Okl. 107 (220 Pac. 860, 861).

13. The defendants requested no instruction upon the question of permanency of injuries and they did not object nor take any exception to the instruction given by the court quoted above, in regard to permanent injuries. Because a physician said he did not know what the future results from an existing injury to the person would be, his evidence should not have been withdrawn from the jury. This court so indicated in the case of *Ahonen* v. *Hryszko, supra*.

14, 15. In their briefs the counsel for defendant criticise remarks alleged to have been made by plaintiff's counsel in reference to the offer to pay the expenses incurred by plaintiffs. No request was made for the jury to be instructed to disregard the remarks. No instruction was sought by defendants. The record does not disclose any material improper remarks of counsel for plaintiff. The first reference to such remarks is in a motion for a new trial. It is only error which is legally excepted to that can be reviewed upon an appeal: *Bagley* v. *Int. Harv. Co.,* 99 Or. 520 (195 Pac. 348).

It will be noticed in regard to the case of J. J. Barron, No. 1, for personal injuries, from the charge of the court as quoted above, that the instructions differed from those in the case of Mrs. Barron. As we understand the charge the question of permanent injuries of J. J. Barron was not submitted to the jury. There were three cases submitted to the jury at the same time and the charge of the court refers to the cases separately. However, the size of the verdict in the J. J. Barron case, No. 1, shows that the jury paid careful attention to the evidence and that they did not consider the question of permanent injuries, and were not misled by any instruction of the court. The sum of $775, which was allowed in

that case, shows the jury was fair, impartial and not prejudiced. It is supported by the testimony and the verdict should not be disturbed.

J. J. Barron did not claim, by the testimony, damages for permanent injuries. This is disclosed by the evidence of Dr. Besson. There is no claim of error that we find in the case of *J. J. Barron* v. *George Duke and Fred Duke, No. 2,* for injuries to the automobile.

From a careful examination of the record we find no reversible error in either case. The judgments of the trial court in each of the three cases are affirmed.                    AFFIRMED.    REHEARING DENIED.

McBRIDE, C. J., and BROWN and BELT, JJ., concur.